# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THERESA WESTON SAUNDERS,

    Plaintiff,

      v.

                 **Civil Action No. 02-1803 (CKK)**

DISTRICT OF COLUMBIA, *et al.*,

    Defendants.

## MEMORANDUM OPINION
(August 2, 2013)

Plaintiff Teresa Saunders filed suit against the District of Columbia, Natwar Gandhi, and Earl Cabbell asserting a number of claims arising out of the Plaintiff's termination from employment with the District. The Defendants now seek summary judgment on each of the Plaintiff's three remaining claims: retaliation in violation of the False Claims Act, racial discrimination in violation of 42 U.S.C. § 1981, and deprivation of liberty without due process in violation of 42 U.S.C. § 1983. The Plaintiff does not oppose the Defendants' motion with respect to her claims under sections 1981 and 1983, but contends her claim of retaliation in violation of the False Claims Act should go to a jury. Upon consideration of the pleadings,[1] the relevant legal authorities, and the summary judgment record, the Court finds the Plaintiff failed to set forth a prima facie case of retaliation under the False Claims Act. Accordingly, the Defendants are entitled to summary judgment on all remaining claims in this case.

---

[1] Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. [101]; Pl.'s Opp'n, ECF Nos. [105, 107]; Defs.' Reply, ECF No. [110]. The Plaintiff also sought leave to file a sur-reply. Pl.'s Mot. for Leave, ECF No. [111]. None of the issues identified as topics for the Plaintiff's sur-reply are material to the Court's disposition of this case, therefore the Court denies the Plaintiff's motion.

# I. BACKGROUND

The Plaintiff was employed in various financial management positions with the District of Columbia from August 1982 through July 2000.  Defs. Stmt. ¶ 1.[2]  In June 1999, City Administrator Norman Dong and Chief Financial Officer for the District of Columbia Valerie Holt assigned the Plaintiff to serve as the Chief Financial Officer of the Office of the Chief Technology Officer ("OCTO").  Pl.'s Ex. C (Holt Decl.) ¶¶ 8.  The Plaintiff was tasked with preparing financial statements for the expenditure of federal funds in connection with the District of Columbia's "Y2K" conversion program.  *Id.*  Suzanne Peck served as the Chief Technology Officer while the Plaintiff worked on the Y2K project.  *E.g.*, Pl.'s Ex. H (Saunders Decl.) ¶ 7.  As the Chief Financial Officer for the OCTO, the Plaintiff worked closely with the OCTO, but continued to report to Valerie Holt.  *Id.* at ¶ 10; Pl.'s Ex. J (Natwar Dep.) at 19:15-10:3; *see also* Natward Dep. at 20: 4-9 (indicating that CFOs assigned to specific agencies "are supposed to work very closely" with the assigned agency, but "it's only the [District] CFO who is their boss").

While serving as the Chief Financial Officer of OCTO, the Plaintiff alleges that she "discovered and reported numerous deficiencies in procurement and financial management operations," including that in many cases OCTO contracts did not comply with District and federal regulations.  Def.'s Stmt. ¶¶ 3, 4.[3]  The Plaintiff produced a "Financial Status Report" for the Y2K project on July 9, 1999, which indicated that "[t]he internal controls for the process of

---

[2]  The Court shall refer to Defendants' Statement of Material Facts ("Defs.' Stmt."), or directly to the record, unless a statement is contradicted by the Plaintiff, in which case the Court may cite to Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("Pl.'s Resp. Stmt.").

[3]  The Court makes no finding as to whether the Plaintiff's conduct as described in this section constituted "protected activity" for purposes of the False Claims Act.

approving and reporting financial transactions may require strengthening," and that "[t]hese potential internal control deficiencies could adversely affect the District's ability to record, process, summarize, and report financial data consistent with governmental accounting reporting requirements."  Pl.'s Ex. H (Saunders Decl.), Attach. 1 (7/9/1999 Report) at 2.  The Plaintiff alleges Ms. Peck was "furious" at the Plaintiff for submitting the July 9, 1999, report, stating that: Ms. Peck "stood at the door of my office and threw the report on the floor near my feet and yelled at me; she yelled she would get me out of OCTO."  Saunders Decl. ¶ 18.  Ulysses Little, who worked for the Plaintiff on the Y2K project, likewise indicated that when the Plaintiff "started pointing out inconsistencies and other problems to Ms. Peck, Ms. Peck's attitude and behavior toward Ms. Saunders and the team changed dramatically.  The environment became very tense and intimidating."  Pl.'s Ex. E (Little Decl.) ¶ 6.  Ms. Peck also expressed dissatisfaction towards the Plaintiff at having to attend regular status meetings regarding the Y2K project as a result of the Plaintiff's report.  Saunders Decl. ¶ 22.

In August 1999, Ms. Peck reportedly complained to the District of Columbia Financial Control Board that the Plaintiff refused to reimburse expenses incurred by certain contractors, including "21 Critical Items" totaling over $21,000,000.  Saunders Decl. ¶ 26.  Upon learning of Ms. Peck's complaint from Valerie Holt, the Plaintiff submitted a memorandum to the Control Board, explaining why the Plaintiff declined to authorize payment of various invoices.  Saunders Decl., Attach. 2 (8/27/1999 Mem. T. Saunders to W. Parker); *see also id.* (explaining that "$18,014,000 was rejected because no budget or funding existed").  The Plaintiff asserts that the Control Board agreed with her actions but that Ms. Peck was angry with the Plaintiff.  Saunders Decl. ¶¶ 27-28.

Four days after submitting her memorandum to the Control Board, the Plaintiff submitted

a memorandum to Ms. Peck, copying Norman Dong and Valerie Holt among others, concerning

the "[v]alidation of IBM [i]nvoices." Saunders Decl., Attach. 3 (8/31/1999 Report).[4] The report

indicated, among other things, that supporting documentation was not available for four invoices

totaling $7,194,855.60, and a total of $13,812,508 was disallowed because the expenditures were

"incurred without the appropriate budget authority." *Id.* at 2. The report also recommended

"based on the discrepancies identified in the labor hours charged, that a thorough review be

conducted by the Y2K Program office for other related costs (such as travel claims) that have

been included in the invoices to provide assurances that all costs are accurate and appropriate."

*Id.* at 6. Ms. Peck was angered by the report, and purportedly told the Plaintiff that "she would

make sure [the Plaintiff] would not be a CFO in the D.C. Government anywhere." Saunders

Decl. ¶ 32.

At some unspecified point Ms. Peck asked Ms. Holt to replace the Plaintiff as the Chief

Financial Officer for the OCTO, but Ms. Holt declined to do so. Holt Decl. ¶ 20. Ms. Holt

indicates that "Ms. Peck kept trying however, and at one point the Mayor's Chief of Staff told

[Holt] that Peck wasn't happy about [Holt's] unwillingness to change CFOs and wasn't there

something [Holt] could do." *Id.* On October 10, 1999, Valerie Holt transferred Plaintiff to the

position of Chief Financial Officer for the District of Columbia Lottery. Saunders Decl. ¶ 40.

The Plaintiff did not request the transfer, but was "pleased to assume" the position at the D.C.

Lottery. *Id.* at ¶ 41. Ms. Holt explained that she "knew that Ms. Saunders' situation at OCTO

was very stressful so the move to [sic] Lottery seemed to make sense." Holt Decl. ¶ 21.

Valerie Holt's appointment as Chief Financial Officer for the District expired in May

---

[4] At some point the Plaintiff also provided her August 31, 1999, report to the United
States Department of the Treasury, the Office of Management and Budget, and the United States
Government Accountability Office. Saunders Decl. ¶ 33.

2000.  Holt Decl. ¶ 22.  Mayor Anthony Williams appointed Dr. Natwar Gandhi to replace Ms.

Holt in late May.  Pl.'s Ex. J (Natwar Dep.) at 15:3-13.  Prior to his appointment as Chief

Financial Officer, Dr. Gandhi served for approximately two years as a tax commissioner,

reporting to Anthony Williams before Mr. Williams' successful run for Mayor.  *Id.* at 13:1-5;

14:12-18.  Dr. Gandhi appointed Stanley Jackson to serve as his chief of staff.  Defs.' Stmt. ¶ 11.

The Plaintiff alleges that Mr. Jackson contacted the Plaintiff in late May 2000 to inquire whether

the Plaintiff would be interested in joining a "Special Projects Team" led by Earl Cabbell.

Saunders Decl. ¶ 44.  The Plaintiff informed Mr. Jackson that she was not interested in the

position, but on June 19, 2000, the Plaintiff was transferred to the Special Projects Team.  *Id.* at ¶

45.

The Plaintiff attended a "[k]ick-off" meeting for the Special Projects Team on June 22,

2000, and was "introduced as part of the team."  Saunders Decl. ¶ 48.  The parties disagree

significantly as to what transpired next.  The Plaintiff claims that Mr. Cabbell agreed to provide

the Plaintiff with a "transition period," and that she began working fulltime on the team on June

29, 2000.  *Id.* at ¶¶ 46, 48.  With advanced notice, the Plaintiff took off one morning, but

otherwise asserts she was not absent from work after June 29.  *Id.* at ¶ 55.  By contrast, Mr.

Cabbell testified that the Plaintiff informed him that "[s]he had to work through a transition

phase with whoever the new CFO was" for the Lottery, while Mr. Cabbell was under the

impression she would be available to the Special Projects Team immediately.  Pl.'s Ex. I

(Cabbell Dep.) at 81:6-82:5; 83:14-84:8.  Mr. Cabbell reported his confusion to Stanley Jackson,

who indicated he would "take care of it."  *Id.* at 84:10-85:5.  The Plaintiff subsequently appeared

at the offices for the Special Projects Team, but not on a full-time basis.  *Id.* at 86:18-25.  Mr.

Cabbell testified at his deposition that the Plaintiff "participated in a few things, but then she

5

would leave, would only be there a half day or whatever saying she had to go back" to the

Lottery. *Id.* at 88:14-17. Mr. Cabbell once again asked Mr. Jackson when the Plaintiff would be

available to the Special Projects Team full-time. *Id.* at 88:17-89:3; *but see* Pl.'s Ex. D (Jackson

Decl.) ¶ 8-9 (indicating that he "do[es] not remember hearing these statements from Cabbell").

Regardless of what transpired after June 19, 2000, the parties agree that on July 21, 2000, the

Office of the Chief Financial Officer terminated the Plaintiff. Pl.'s Ex. M (7/21/2000

Termination Ltr.). This suit followed.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must
> support the assertion by:
>
> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations (including those made for purposes of the motion only),
> admissions, interrogatory answers, or other materials); or
>
> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot produce admissible
> evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to

properly address another party's assertion of fact as required by Rule 56(c), the court may . . .

consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). When

considering a motion for summary judgment, the court may not make credibility determinations

or weigh the evidence; the evidence must be analyzed in the light most favorable to the

nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby*,

Inc., 477 U.S. 242, 255 (1986).  "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available."  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment.  *See Liberty Lobby*, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id*.  For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party.  *Id*.  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251–52.  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Id*. at 249–50 (internal citations omitted).  The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute.  *See Ass'n of Flight Attendants–CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009).

### III. DISCUSSION

The Defendants moved for summary judgment with respect to each of the Plaintiff's remaining claims.  The Plaintiff elected not to oppose the Defendant's motion for summary judgment with respect to her racial discrimination and due process claims. Pl.'s Opp'n at 29-30. The only question remaining for the Court is whether the Defendants are entitled to summary

judgment on the Plaintiff's claim that her termination was in retaliation for the Plaintiff engaging

in protected activity, and thus in violation of the False Claims Act.

> At the time the Plaintiff's claim accrued, the False Claims Act provided that

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in
> any other manner discriminated against in the terms and conditions of
> employment by his or her employer because of lawful acts done by the employee
> on behalf of the employee or others *in furtherance of an action under this section,
> including investigation for, initiation of, testimony for, or assistance in an action
> filed or to be filed under this section*, shall be entitled to all relief necessary to
> make the employee whole.  Such relief shall include reinstatement with the same
> seniority status such employee would have had but for the discrimination, 2 times
> the amount of back pay, interest on the back pay, and compensation for any
> special damages sustained as a result of the discrimination, including litigation
> costs and reasonable attorneys' fees. An employee may bring an action in the
> appropriate district court of the United States for the relief provided in this
> subsection.

31 U.S.C. § 3730(h) (2000) (emphasis added).  Enacted in 1986, this section was "designed to

protect persons who assist the discovery and prosecution of fraud and thus to improve the federal

government's prospects of deterring and redressing crime."  *Neal v. Honeywell Inc.*, 33 F.3d 860,

861 (7th Cir.1994), *abrogated on other grounds by Graham Cnty. Soil & Water Conservation

Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416–17 (2005).  "This language states two

basic elements: (1) acts by the employee 'in furtherance of' a suit under § 3730—acts also

known as 'protected activity'; and (2) retaliation by the employer against the employee 'because

of' those acts."  *United States ex. rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1237 (D.C. Cir.

2012).  The *McDonnell Douglas* burden-shifting framework governs the Court's analysis of the

Plaintiff's retaliation claim.  *Schweizer*, 677 F.3d at 1241.

> Adapting McDonnell Douglas to the FCA's anti-retaliation provision, a plaintiff
> first must set forth a prima facie case of retaliation.  Once this is accomplished,
> the burden then shifts to the defendant to articulate a legitimate, nonretaliatory
> reason for the adverse employment action.  This imposes merely a burden of
> production, not one of proof.  Thus, if the employer produces evidence of a
> legitimate nonretaliatory reason, the plaintiff must assume the further burden of

showing that the proffered reason is a pretext calculated to mask retaliation.

*Harrington v. Aggregate Industries Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012) (citations

omitted). With respect to the second element of the cause of action, "[i]n order to make out a

prima facie case at the summary judgment stage . . . [the] plaintiff is required to produce

evidence of retaliation sufficient for a reasonable jury to conclude that [her] protected activity

was a contributing factor in the alleged prohibited personnel action." *Payne v. District of*

*Columbia*, --- F.3d ---, 2013 WL 2450503, at * 8 (D.C. Cir. June 7, 2013).

The parties devote most of their pleadings to the first element of a prima facie case of

retaliation: whether the Plaintiff engaged in protected activity. The Court does not reach this

question because the Plaintiff failed to put forth sufficient evidence to create a genuine issue of

material fact regarding whether her purported protected activity was a motivating factor in the

Plaintiff's termination. The entirety of the Plaintiff's argument regarding causation is as follows:

> CFO Holt, who had resisted Ms. Peck's efforts to remove Ms. Saunders, was—
> effective mid- May 2000, no longer CFO. Instead, Natwar Gandhi, with closer
> ties to Mayor Williams, became CFO and Ms. Saunders' boss; and Earl Cabbell,
> also with close ties to Mayor Williams assumed a key role in dealing with Ms.
> Saunders. During the period of the adverse actions against Ms. Saunders, the
> Pecks were giving significant financial support to the Mayor Williams' hotly-
> contested school governance reform effort. . . . The coincidence that almost
> immediately after Ms. Holt's leaving and Dr. Gandhi's assuming the CFO
> position did the government abruptly and suddenly move against Ms. Saunders
> begs for an explanation.

Pl.'s Opp'n at 20-21. In other words, the Plaintiff's "prima facie" case of causation rests entirely

on the fact that (1) Ms. Peck was "politically connected" to Mayor Williams; (2) Dr. Gandhi had

"closer ties" to Mayor Williams than his predecessor Ms. Holt had to the Mayor; and (3) the

Plaintiff was terminated two months after Dr. Gandhi was appointed.

Citing only to her own declaration, the Plaintiff asserts that it was "well-known that

Suzanne Peck was politically well-connected" at the time of Plaintiff's termination. Saunders

Decl. ¶ 58.  "[A] few of [the Plaintiff's] D.C. colleagues mentioned they believed Peck and/or husband [sic] had made significant contributions to Mayor Williams or causes he supported."  *Id.* The Plaintiff submitted a "contributor report" indicating that Ms. Peck contributed $5,000 to the "Better Schools Political Action Committee" on November 2, 2000—over three months after the Plaintiff's termination.  Pl.'s Ex. P.  The Plaintiff also produced a contributor report reflecting a $40,000 donation from an individual named Paul Peck to the New School Leadership Committee.  Pl.'s Ex. O.  Based on a press release provided by Plaintiff, it appears the New School Leadership Committee supported an education ballot measure backed by the Mayor. Pl.'s Ex. N (6/23/2000 Press Releases).  Nevertheless, the Plaintiff offers no evidence—direct or circumstantial—demonstrating any communications between the Plaintiff and Mayor Williams or his staff after the Plaintiff left the OCTO.

There is no evidence in the record that the individual who fired the Plaintiff (Dr. Gandhi) was aware of the Plaintiff's purported protected activities, all of which occurred over eight months before Dr. Gandhi was appointed as Chief Financial Officer.  There is no evidence to suggest that Stanley Jackson was aware of the Plaintiff's purported activities, which occurred over eight months before Mr. Jackson was appointed Dr. Gandhi's chief of staff.  The *Plaintiff* submitted a declaration from Mr. Jackson in support of her claims, but Mr. Jackson does not indicate that he had any knowledge of the Plaintiff's work on the Y2K project.  *See generally* Pl.'s Ex. D.  Nor is there any evidence that the Plaintiff's supervisor (Mr. Cabbell) was aware of the Plaintiff's purported protected activities, the last of which occurred over nine months before the Plaintiff was assigned to the Special Projects Team.  To the contrary, Mr. Cabbell denied knowing anything about the issues concerning financial statements from OCTO for the Y2K project, and the Plaintiff offers no evidence to rebut Mr. Cabbell's testimony.  Cabbell Dep.

70:18-23.

Moreover, there is no evidence in the record to suggest Dr. Gandhi or Mr. Cabbell had any contact with Mayor Williams or Ms. Peck regarding the Plaintiff prior to her termination. "All [Saunders] really offers is evidence that [s]he made a protected disclosure and that at a later time [s]he suffered a termination.  The fact that one event precedes another does not in itself evidence causation."  *Payne*, 2013 WL 2450503, at *8.

Apart from the gaping evidentiary holes, the Plaintiff also fails to articulate any theory as to how the political connections emphasized in her brief led to her termination.  It is unclear whether the Plaintiff is implying that Ms. Peck knew Dr. Gandhi and asked him to terminate the Plaintiff, or whether the Plaintiff believes Ms. Peck convinced Mayor Williams to ask Dr. Gandhi to terminate the Plaintiff.  This omission is significant because the only individual the Plaintiff suggests was upset by her protected activity was not the Plaintiff's supervisor (or even within her office), and was not directly responsible for the Plaintiff's termination.  Absent any explanation as to how allegedly Ms. Peck was involved in the Plaintiff's termination, the Court cannot determine whether the ultimate decision maker can be imputed with any retaliatory intent *Ms. Peck* might have harbored.  On this record, the Plaintiff failed to set forth a prima facie case that her termination was motivated by her alleged protected activity.

## IV.  CONCLUSION

The Plaintiff devotes large portions of her opposition to disputing the District's proffered reason for her termination.  However, the Court cannot reach any of the Plaintiff's arguments because the Plaintiff failed to produce sufficient evidence from which a reasonably jury could conclude that the Plaintiff's alleged protected activity was a motivating factor in her termination. The Plaintiff failed to satisfy her preliminary burden to establish a prima facie case of retaliation,

thus the Defendants are entitled to summary judgment on the Plaintiff's False Claims Act charge, in addition to the claims the Plaintiff conceded.   Accordingly, the Defendants' motion for summary judgment is granted.   An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE